*Attorney Grievance Commission of Maryland v. Edward Smith Jr.*, Misc. Docket AG No. 26 & 74, September Term, 2016.

**ATTORNEY DISCIPLINE** – Attorney's incompetence, lack of diligence in handling his clients' matters, failure to communicate with his clients, failure to keep client funds in his trust account before they were earned, failure to create and maintain records of received and disbursed client funds, failure to properly terminate representation, his commingling of funds, his prohibited use of his trust account, and his misrepresentations to Bar Counsel and his clients warrant the sanction of disbarment. Attorney's conduct violated Rules 19-301.1, 19-301.2, 19-301.3, 19-301.4, 19-301.5, 19-301.15, 19-301.16, 19-305.3, 19-308.1, 19-308.4, 19-404, 19-407, 19-408, and 19-410.

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 26
Misc. Docket AG No. 74

September Term, 2016

―――――――――――――――――――――――

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

EDWARD SMITH, JR.

―――――――――――――――――――――――

Barbera, C.J.
Greene,
McDonald,
Hotten,
Getty,
Battaglia, Lynne A. (Senior Judge, specially assigned),
McAuliffe, John F. (Senior Judge, specially assigned),

JJ.

―――――――――――――――――――――――

Opinion by Greene, J.

―――――――――――――――――――――――

Filed: January 19, 2018

On August 8, 2016, the Attorney Grievance Commission of Maryland ("Petitioner" or "Bar Counsel"), acting pursuant to Maryland Rule 19-721, filed a "Petition for Disciplinary or Remedial Action" against Edward Smith, Jr. ("Respondent"). On December 17, 2016, Petitioner filed a second "Petition for Disciplinary or Remedial Action" against Respondent. These petitions, arising out of Respondent's representation of three individuals in separate post-conviction proceedings, alleged that Respondent violated various Maryland Attorney's Rules of Professional Conduct ("MARPC" or "Rule"),[1] specifically 19-301.1 (Competence),[2] 19-301.2 (Scope of Representation and Allocation of Authority Between Client and Attorney),[3] 19-301.3 (Diligence),[4] 19-301.4

---

[1] On July 1, 2016, the Rules governing Attorneys were retitled in Title 19 of the Maryland Rules. At the time of the misconduct, the Rules governing Attorneys were codified in Title 16 of the Maryland Rules. At the time of Bar Counsel's filing and the relevant proceedings, the Rules were codified in Title 19 of the Rules. The hearing judge referred to the Rules as they were codified at the time of the hearing; therefore, to remain consistent with the hearing judge, this opinion will cite to the Rules as they are currently codified in Title 19.

[2] MARPC 19-301.1 provides: "An attorney shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

[3] MARPC 19-301.2 provides, in relevant part: "(a) Subject to sections (c) and (d) of this Rule, an attorney shall abide by a client's decisions concerning the objectives of the representation and, when appropriate, shall consult with the client as to the means by which they are to be pursued. An attorney may take such action on behalf of the client as is impliedly authorized to carry out the representation."

[4] MARPC 19-301.3 provides, in relevant part: "An attorney shall act with reasonable diligence and promptness in representing a client."

(Communication),[5] 19-301.5 (Fees),[6] 19-301.15 (Safekeeping Property),[7] 19-301.16

(Declining or Terminating Representation),[8] 19-305.3 (Responsibilities Regarding Non-

---

[5] MARPC 19-301.4 provides, in relevant part:
(a) An attorney shall:
(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 19-301.0(f)(1.0), is required by these Rules;
(2) keep the client reasonably informed about the status of the matter;
(3) promptly comply with reasonable requests for information; and
(4) consult with the client about any relevant limitation on the attorney's conduct when the attorney knows that the client expects assistance not permitted by the Maryland Attorneys' Rules of Professional Conduct or other law.
(b) An attorney shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

[6] MARPC 19-301.5 provides:
(a) An attorney shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the attorney;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount of involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the attorney or attorneys performing the services; and
(8) whether the fee is fixed or contingent.
(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the attorney will charge a regularly represented client on the same basis or rate.

(continued . . .)

2

Any charges in the basis or rate of the fee or expenses shall also be communicated to the client.

(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by section (d) of this Rule or other law. A contingent fee agreement shall be in a writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the attorney in the event of settlement, trial or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be responsible whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the attorney shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination.

(d) An attorney shall not enter into an arrangement for, charge, or collect:

(1) any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a divorce or custody of a child or upon the amount of alimony or support or property settlement, or upon the amount of an award pursuant to Md. Code, Family Law Article, §§ 8-201 through 8-213; or (2) a contingent fee for representing a defendant in a criminal case.

(e) A division of a fee between attorneys who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each attorney or each attorney assumes joint responsibility for the representation;

(2) the client agrees to the joint representation and the agreement is confirmed in writing; and

(3) the total fee is reasonable.

[7] MARPC 19-301.15 provides:

(a) An attorney shall hold property of clients or third persons that is in an attorney's possession in connection with a representation separate from the attorney's own property. Funds shall be kept in a separate account maintained pursuant to Title 19, Chapter 400 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and

(continued . . . )

appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the attorney and shall be preserved for a period of at least five years after the date the record was created.

(b) An attorney may deposit the attorney's own funds in a client trust account only as permitted by Rule 19-408(b).

(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, an attorney shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the attorney's own benefit only as fees are earned or expenses incurred.

(d) Upon receiving funds or other property in which a client or third person has an interest, an attorney shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, an attorney shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property.

(e) When an attorney in the course of representing a client is in possession of property in which two or more persons (one of whom may be the attorney) claim interests, the property shall be kept separate by the attorney until the dispute is resolved. The attorney shall distribute promptly all portions of all portions of the property as to which the interests are not in dispute.

[8] MARPC 19-301.16 provides, in relevant part:

(d) Upon termination of representation, an attorney shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of another attorney, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The attorney may retain papers relating to the client to the extent permitted by other law.

Attorney Assistants),[9] 19-308.1 (Bar Admission and Disciplinary Matters),[10] 19-308.4

(Misconduct),[11] 19-404 (Trust Account – Required Deposits),[12] 19-407 (Attorney Trust

---

[9] MARPC 19-305.3 provides, in relevant part:

With respect to a non-attorney employed or retained by or associated with an attorney:

(a) a partner, and an attorney who individually or together with other attorneys possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the attorney;

(b) an attorney having direct supervisory authority over the non-attorney shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the attorney;

(c) an attorney shall be responsible for conduct of such a person that would be a violation of the Maryland Attorneys' Rules of Professional Conduct if engaged in by any attorney if:

(1) the attorney orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2) the attorney is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action[.]

[10] MARPC 19-308.1 provides:

An applicant for admission or reinstatement to the bar, or an attorney in connection with a bar admission application or in connection with a disciplinary matter, shall not:

(a) knowingly make a false statement of material fact; or

(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 19-301.6 (1.6).

[11] MARPC 19-308.4 provides in relevant part:

It is professional misconduct for an attorney to:

(a) violate or attempt to violate the Maryland Attorneys' Rules of Professional Conduct, knowingly assist or induce another to do so, or do

(continued . . .)

so through the acts of another;

(b) commit a criminal act that reflects adversely on the attorney's honesty, trustworthiness or fitness as an attorney in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice[.]

[12] MARPC 19-404 provides:

Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This Rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person.

(. . . continued)

Account Record-Keeping),[13] 19-408 (Commingling of Funds)[14] and 19-410 (Prohibited

Transactions).[15] On January 4, 2017, upon Petitioner's motion, this Court issued an order

consolidating the petitions.

---

[13] MARPC 19-407 provides:

(a) **Creation of Records**. The following records shall be created and maintained for the receipt and disbursement of funds of clients or of third persons:

(1) Attorney Trust Account Identification. An identification of all attorney trust accounts maintained, including the name of the financial institution, account number, account name, date the account was opened, date the account was closed, and an agreement with the financial institution establishing each account and its interest-bearing nature.

(2) Deposits and Disbursements. A record for each account that chronologically shows all deposits and disbursements, as follows:

(A) for each deposit, a record made at or near the time of the deposit that shows (i) the date of the deposit, (ii) the amount, (iii) the identity of the client or third person for whom the funds were deposited, and (iv) the purpose of the deposit;

(B) for each disbursement, including a disbursement made by electronic transfer, a record made at or near the time of disbursement that shows (i) the date of the disbursement, (ii) the amount, (iii), the payee, (iv) the identity of the client or third person for whom the disbursement was made (if not the payee), (v) the purposes of the disbursement.

(C) for each disbursement made by electronic transfer, a written memorandum authorizing the transaction and identifying the attorney responsible for the transaction. Cross references *See* Rule 19-410(c), which provides that a disbursement that would create a negative balance with respect to any individual client matter or with respect to all client matters in the aggregate is prohibited.

(3) Client Matter Records. A record for each client matter in which the attorney receives funds in trust, as follows:

(A) for each attorney trust account transaction, a record that shows (i) the date of the deposit or disbursement; (ii) the amount of the deposit or disbursement; (iii) the purpose for which the funds are intended; (iv) for a disbursement, the payee and the check number or other payment identification; and (v) the balance of funds remaining in the account in connection with the matter; and

(continued . . .)

(B) an identification of the person to whom the unused portion of a fee or expense deposit is to be retuned whenever it is to be returned to a person other than the client.

(4) Record of Funds of the Attorney. A record that identifies the funds of the attorney held in each attorney trust account as permitted by Rule 19-408(b).

(b) **Monthly Reconciliation**. An attorney shall cause to be created a monthly reconciliation of all attorney trust account records, client matter records, records of funds of the attorney held in an attorney trust account as permitted by Rule 19-408(b), and the adjusted month-end financial institution statement balance. The adjusted month-end financial institution statement balance is computed by adding subsequent deposits to and subtracting subsequent disbursements from the financial institution's month-end statement balance.

(c) **Electronic Records**. Whenever the records required by this Rule are created or maintained using electronic means, there must be an ability to print a paper copy of the records upon a reasonable request to do so.

(d) **Records to be Maintained**. Financial institution month-end statements, any canceled checks or copies of canceled checks provided with a financial institution month-end statement, duplicate deposit slips or deposits receipts generated by the financial institution, and records created in accordance with section (a) of this Rule shall be maintained for a period of at least five years after the date the record was created.

[14] MARPC 19-408 provides:

(a) **General Prohibition**. An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 19-404 or permitted to be so deposited by section (b) of this Rule.

(b) **Exceptions**. (1) An attorney or law firm shall either (A) deposit into an attorney trust account funds to pay any fees, services charges, or minimum balance required by the financial institution to open or maintain the account, including those fees that cannot be charged against interest due to the Maryland Legal Services Corporation Fund pursuant to Rule 19-411(b)(1)(D), or (B) enter into an agreement with the financial institution to have any fees or charges deducted from an operating account maintained by the attorney or law firm. The attorney or law firm may deposit into an attorney trust account any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney by the client.

(2) An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the

This Court referred the matter to the Honorable Yvette M. Bryant of the Circuit Court for Baltimore City for a hearing and to render findings of fact and conclusions of law pursuant to Rule 19-727. Judge Bryant conducted an evidentiary hearing on April 25, April 26, May 1, and May 2, 2017. Thereafter, Judge Bryant issued Findings of Fact and Conclusions of Law, in which she found, by clear and convincing evidence, that Respondent's acts constituted violations of Rules 19-301.1, 19-301.2, 19-301.3, 19-301.5(a), 19-301.15(a), (c), (d), and (e), 19-301.16(d), 19-305.3(a) and (b), 19-308.1(a), (b), 19-308.4(a), (b), (c) and (d), 19-404, 19-407(a)(2)(A), (a)(2)(B), (a)(3)(A), (a)(3)(b), and b), 19-408, and 19-410(c). For the reasons explained herein, we conclude that the

---

(. . . continued)
    attorney or law firm.
    The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.
    (3) Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.

[15] MARPC 19-410 provides:
    (a) **Generally**. An attorney or law firm may not borrow or pledge any funds required by the Rules in this Chapter to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose.
    (b) **No Cash Disbursements**. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer, and no cash withdrawal may be made from an automated teller machine or by any other method. All disbursements from an attorney trust account shall be made by check or electronic transfer.
    (c) **Negative Balance Prohibited.** No funds from an attorney trust account shall be disbursed if the disbursement would create a negative balance with regard to an individual client matter or all client matters in the aggregate.

hearing judge's conclusions of law as to violations of the aforementioned Rules were supported by clear and convincing evidence.

## FINDINGS OF FACT

The hearing judge conducted an evidentiary hearing that lasted four days, after which she made the following findings of fact. Respondent was admitted to practice law in Maryland on December 19, 1975, and has "extensive experience in handling criminal matters, including post-conviction proceedings." Respondent maintained a law practice in Baltimore City, and relied on the assistance of Mr. Calvin Robinson-Bey, whom Respondent had successfully represented in a post-conviction matter. Upon Mr. Robinson-Bey's release, Respondent hired him to assist in drafting post-conviction petitions.

Respondent's representation of Mr. DaJuan Marshall involved the drafting of a post-conviction petition. The hearing judge found that there was a dispute regarding when Respondent's representation of Mr. Marshall actually began:

> In 2011, DaJuan Marshall ("Marshall") received a sentence of life plus 20 years. He appealed his conviction, which was upheld by the Court of Special Appeals and which culminated on December 23, 2013, when the Court of Appeals denied his Petition for Writ of Certiorari.
> In Spring 2014, Marshall's mother, Ms. Tinnie Monroe ("Ms. Monroe") and his stepfather ("Mr. Monroe") consulted with Respondent with a view to instituting post-conviction proceedings. When he initially discussed the matter with the Monroes, Respondent agreed to review the trial transcript, have his "associate" review the transcript, and get in touch with the Monroes. Respondent also advised the Monroes he would charge a "flat fee" of $7,500 for the representation.
> Although there exists no documentation that allows the court to determine the date Respondent definitively agreed to pursue post-conviction proceedings on Marshall's behalf, the record reflects Marshall wrote to Respondent on April 14, 2014, to address some of the issues he found relevant to his proceedings. On May 1, 2014, Respondent wrote Marshall to discuss the matter, although he had not yet reviewed the transcript. . . .

10

During Respondent's representation of Mr. Marshall, the hearing judge found that

Respondent failed to communicate with Mr. Marshall in a meaningful way:

> Other than the one letter written to Marshall in May 2014, Respondent produced no other written communication he initiated to Marshall and did not testify to having sent additional writings to Marshall. Respondent never met with Marshall in person. Between July 2014 and December 20, 2014, when Marshall terminated the attorney-client relationship, Marshall and the Monroes primarily communicated with Mr. Robinson-Bey. . . .
>
> Respondent did not communicate with Marshall in a manner that would allow him to hear Marshall's voice, counsel Marshall regarding the arguments to be made based upon the contents of the transcript once Respondent had an opportunity to review it or counsel Marshall as to the need to preserve his federal rights through a timely filing of the post-conviction petition. Indeed, the most communication Respondent had with Marshall was after Marshall expressed displeasure with the product, days before the petition needed to be filed in order to preserve Marshall's federal habeas corpus rights.
>
> When Marshall discussed his displeasure with the petition Mr. Robinson-Bey prepared, Respondent acknowledged to Marshall that he had not read the petition, but urged Marshall to allow him to file the petition as drafted and amend the petition at a later date. Again, Respondent did not take steps during the conversation to assure Marshall that he would ensure the proposed petition was reworked in time to file a product that would allow for preservation of the federal rights. As a result of the petition not having been filed, Marshall lost his opportunity to seek federal habeas corpus relief, a loss Respondent contends was the result of Marshall having listened to fellow inmates rather than his counsel. Respondent, who recalls only having one conversation with Marshall during the entire representation, is not the least bit contrite about the situation in which Marshall found himself. He attributes the problem singly to Marshall listening to "jailhouse lawyers." []
>
> Respondent's file contains no memoranda or other documentation that would shed light on the dates of any discussions he personally had with Marshall concerning the post-conviction proceedings. The evidence shows Ms. Monroe, Mr. Monroe and Marshall's conversations were held primarily with Mr. Robinson-Bey throughout the course of representation; however, the court does not find Mr. Robinson-Bey or Respondent represented to Ms. Monroe or Marshall that Mr. Robinson-Bey was, in fact, an attorney. Neither does the court find Respondent permitted Mr. Robinson-Bey to hold himself out as an attorney. The court does find that the lack of communication and direct involvement in handling that post-conviction matter is one explanation

11

for Respondent's inability to recall facts and details and to answer fact-specific questions concerning his representation.

Respondent's limited work on Mr. Marshall's case, according to the hearing judge, led to Mr. Marshall's dissatisfaction with Respondent's representation but did not cause Mr. Marshall's failure to preserve his federal habeas corpus rights:

> Upon receiving the transcript, but having received no retainer, Respondent read the transcript, discussed the matter with Mr. Robinson-Bey and assigned to Mr. Robinson-Bey the task of drafting the post-conviction petition.
>
> The court finds that contrary to his earlier representations to Bar Counsel, Respondent did not personally prepare the petition or revise the petition . . . . After directing Mr. Robinson-Bey to draft the petition, Respondent did not supervise Mr. Robinson-Bey's performance in preparing the petition, and, by Respondent's own admission, did not read the post-conviction petition prior to submitting the petition to Marshall for his review in December 2014.
>
> To preserve Marshall's federal habeas corpus rights, post-conviction proceedings needed to be instituted within one year of the December 23, 2013 denial of Marshall's petition for writ of certiorari. 28 U.S.C. § 2244 (d)(1)(A). The court does not find Respondent's actions caused Marshall to refuse to file the petition in order to preserve his federal rights. That was a choice Marshall made, as he certainly could have filed the petition and later filed an amendment. However, the court does find Respondent essentially delegated the entire matter to Mr. Robinson-Bey, could not intelligently respond to Marshall's concerns because he had not ridden herd over the matter and caused Marshall to lose faith in Respondent's ability to properly handle the matter.
>
> The court does not find Respondent delayed providing services to Marshall. The retainer was not paid until late November, weeks before the date the petition needed to be filed to preserve Marshall's federal rights. However, the court finds Respondent's failure to review the post-conviction petition after it was prepared by Mr. Robinson-Bey (whenever that was) and his failure to meaningfully discuss the filing with Marshall until the eleventh hour placed Marshall in the unenviable position of having to make a choice to file the petition "as is" (with which Marshall was not comfortable) and trusting an amendment would suffice or to not file at all. In response to Marshall's concerns, Respondent certainly did not suggest to Marshall that he would personally amend the petition and have it filed no later than December 23, 2014. Moreover, although Marshall outlined his concerns to

12

Respondent in writing, Respondent did not respond to those concerns verbally or in writing.

With regard to Respondent's fee arrangement and handling of Mr. Marshall's funds, the hearing judge found that Respondent did not maintain documentation of the deposit of funds for Mr. Marshall's matter:

> Respondent, having quoted to the Monroes a flat fee of $7,500 for providing representation to Marshall . . . received a check in the amount of $5,000 on November 26, 2014. . . . The agreement executed on December 5, 2014, stated Respondent would not start working on the case until the retainer was paid in full, although Respondent directed Robinson-Bey to begin working on the matter at least as early as Summer 2014.
>
> Respondent deposited the check into his required trust account on December 1, 2014; however, he withdrew funds in an amount equivalent to the retainer amount by month's end (Petitioner's Exhibit 25). Respondent neither created nor maintained documentation of the receipt of the funds from Ms. Monroe for Marshall's benefit beyond filling out a deposit slip. Petitioner produced no client card, computerized printouts or other documents to show he maintained a client ledger for Marshall's matter and produced no documentation to demonstrate when and under what circumstances the funds Respondent received from Ms. Monroe were distributed.

The hearing judge found that upon Mr. Marshall terminating Respondent's services, Respondent misrepresented the status of funds remaining in trust from Mr. Marshall's retainer:

> On December 22, 2014, Respondent's services were terminated. Marshall, through Ms. Monroe, requested a refund of funds paid (Petitioner's Exhibit 5a). Respondent did not respond to Ms. Monroe's March 13, 2017 letter requesting a refund. Having received a copy of Marshall's complaint and a request for information from Bar Counsel (Petitioner's Exhibit 2), on April 23, 2015, Respondent, while failing to provide complete financial records, intentionally misrepresented to Bar Counsel that Ms. Monroe's funds remained in his account (Petitioner's Exhibit 3). He also represented that the final bill would exceed the $5,000 "charged" but that he would keep a balance on his account upon making an accounting.

In his June 3, 2015 letter to Ms. Monroe, Respondent deceptively stated that he [] held $1,000 in "escrow" in the event of a bill dispute. Knowing he had long ago removed the Marshall funds from the trust account, Respondent deceptively stated he would "now" remove $4,000 from the "escrow deposit" that was made on December 1, 2014. Analysis of Respondent's trust account shows at most, Respondent would have retained no more than $1,700 of Ms. Monroe's funds when he wrote to Ms. Monroe on June 3, 2015; thus, there was no "$4,000" to "remove" from escrow.

According to the hearing judge's factual findings, Respondent made misrepresentations to his client as well as Bar Counsel about the extent of work performed on the matter:

While Respondent sought to beguile Ms. Monroe, Bar Counsel was in the midst of an investigation. On June 1, 2015, Bar Counsel sent to Respondent a letter from Marshall and asked for a reply no later than July 16, 2015 (Petitioner's Exhibit 8). Respondent did not reply until July 31, 2015, at which time he represented there existed two drafts of the post-conviction petition. The evidence establishes Mr. Robinson-Bey represented to Marshall that he drafted a version of the post-conviction petition during the summer, but that it had been mistakenly deleted from the computer. To the extent two drafts were completed, the evidence shows the only change made to the initial draft was Marshall's address, as the first version sent to Marshall was misdirected to the wrong facility. Respondent's representation that Mr. Robinson-Bey sent a petition for review, corrected the original petition in accordance with Marshall's review, and sent a second copy to Marshall is pure fabrication (Petitioner's Exhibits 3 and 77).

Respondent also represented to Bar Counsel that Mr. Robinson-Bey spent 205 hours working on Marshall's case. The court finds that Respondent misrepresented the time spent in working on Marshall's file, both as to Respondent's time and to Mr. Robinson-Bey's time. The document was not prepared contemporaneously with work allegedly done, although Mr. Robinson-Bey claims he kept a calendar that held the hours he worked on the project. However, Robinson-Bey's statement in his April 17, 2015 memorandum wherein he alleges he worked on the case until early January convinces the court it is a fabrication, as representation was terminated in December 2014.

On June 3, 2015, after the complaint was filed against him, Respondent wrote and provided an invoice to Ms. Monroe (Petitioner's Exhibit 17). The invoice purported to summarize his time and that of Mr. Robinson-Bey in working on the matter and suggested Respondent was owed

14

$6,855 based upon the amount of time spent on preparing the post-conviction petition. The court does not find credible the billing statement. Neither does the court find credible the calendars submitted to the court purporting to outline the time Robinson-Bey spent working on Marshall's post-conviction matter. Indeed, if the court were to believe what Mr. Robinson-Bey submitted, the court would have to accept as true that Robinson-Bey continued to work on the draft well after Marshall terminated Respondent's services, in fact, until January 10, 2015.

Mr. Robinson-Bey testified at the time of the trial. His testimony conflicted with Respondent's testimony regarding Respondent's level of involvement. Whereas Respondent testified he did not read the draft Robinson-Bey submitted to Marshall, Mr. Robinson-Bey testified Respondent saw the draft. The court does not find credible Mr. Robinson-Bey's testimony regarding Respondent's level of involvement in preparing the petition.

Bar Counsel's letter of August 18, 2015, (Petitioner's Exhibit 10) directing Respondent to provide additional information no later than September 2, 2015, was met with a late request for and grant of an extension of time (Petitioner's Exhibit 11). Respondent did not respond in the time allotted for the extension. When he responded, he did not address the inquiries outlined by Bar Counsel (Petitioner's Exhibit 13) and was again asked to address the specific inquiries no later than August 18, 2015 (Petitioner's Exhibit 13). Respondent replied on September 25, 2015. In the reply, he represented that he reviewed Robinson-Bey's drafts, contrary to testimony Respondent gave at trial (Petitioner's Exhibit 14).[16] Additional correspondence from Bar Counsel yielded no substantive response to Bar Counsel's original August 18, 2015 letter as Respondent simply did not address each of the specific inquiries (Petitioner's Exhibit 14 and 15).

The hearing judge made the following factual findings regarding Respondent's maintenance of his trust account, in light of his handling of Mr. Marshall's funds:

On October 19, 2015, having still received less than a satisfactory response, Bar Counsel again wrote Respondent, who again represented he was holding Ms. Monroe's funds in trust (Petitioner's Exhibits 18 and 19). The evidence, however, shows Respondent's trust account went into overdraft status on June 22, 2015; thus, Ms. Monroe's funds were not being held in trust as represented (Petitioner's Exhibits 19, 26 and 27). Respondent

---

[16] Respondent did not testify to the contrary in his testimony at trial. In his deposition, however, Mr. Marshall stated that Respondent admitted that he had not read the petition prior to it being sent to Mr. Marshall for review.

15

continued to misrepresent he was holding Ms. Monroe's funds when he drafted and sent his letter dated October 27, 2015 (Petitioner's Exhibit 24).

At no time did Respondent ever supply to counsel information or documentation to support his receipt, maintenance or disbursement of Ms. Monroe's funds. Indeed, only on one occasion did he supply any financial documents, and then, he supplied documents he surmised would hide the fact that he was not, in fact, holding Ms. Monroe's funds in trust (Petitioner's Exhibit 3). Bar Counsel ultimately issued a subpoena for Respondent's trust account records. Analysis of the records shows, clearly and convincingly, that Respondent was not holding Ms. Monroe's money in trust as and when represented.

Analysis also reveals Respondent deposited money from unspecified and unverifiable sources into the trust account, commingled personal funds, used the account for matters other than client matters, and allowed the account to fall into a negative balance. This court is not prepared to state Respondent "misappropriated funds to his own use," altogether it appears he borrowed from Peter to satisfy Paul and, to that extent, misappropriated various clients' funds (Petitioner's Exhibits 26 and 27).

The evidence shows Respondent caused and/or allowed the following transactions from his trust account:

1. The creation of a negative balance in the amount of $372.90 caused by Respondent writing a check to himself on June 19, 2015 in the amount of $1,200;

2. A February 18, 2015 deposit of funds that appears tied to no client's matter, that cannot be documented as pertaining to any client's matter and that appears related to a copy machine; and

3. Non-client-related disbursements for tithes (January 5, 2015), copy machine expenses (January 22, 2015, February 18, 2015, April 10, 2015 and September 4, 2015), legal printing (February 20, 2015), and property taxes (March 25, 2015).

Respondent's mismanagement of the trust account led to the creation of negative balances with respect to five clients' "ledgers." Respondent's apparent mismanagement of the account also led Bar Counsel, on November 19, 2015 to make further inquiry concerning the trust account (Petitioner's Exhibit 28). Despite requests for an extension and promises of a reply, Respondent provided no additional information related to the trust accounts (Petitioner's Exhibits 29 and 30). Respondent did not refund any of Ms. Monroe's funds.

16

Bar Counsel's allegations of Respondent's misconduct also related to his

representation of Ms. Mashea Simmons, who was interested in post-conviction relief:

> In April 2015, Respondent met with Lillian Ray ("Ray"), the Mother of Mashea Simmons. Ray was interested in having Respondent represent Ms. Simmons in post-conviction proceedings, Ms. Simmons having been convicted of murder in 2012 and having received a life sentence. Respondent quoted Ray a flat fee of $7,500 for the representation. Ray signed an updated retainer agreement that has a suggestion of having been prepared in March but that was mailed to Ray on April 17, 2015 (Petitioner's Exhibit 74). Ray paid the full fee on April 23, 2015 (Petitioner's Exhibit 67 and Exhibit 74-billing statement). Respondent acknowledges he did not deposit any of Ray's funds into his trust account; rather, he placed the funds in his operating account.

> At the time Ray initially consulted with Respondent, Ms. Simmons was matriculating through the appellate process. In fact, on April 17, 2015, just days before the retainer was paid, the Court of Appeals granted Simmons' Petition for Writ of Certiorari (Petitioner's Exhibit 77, p. 16, which in turn relates to Petitioner's Complaint, paragraph 6). On April 23, 2015, Simmons' public defender (Mr. Braudes) notified her that the court granted her petition. Simmons, in turn, sent a copy of the letter to Respondent. On April 27, 2015, Respondent met with Simmons to discuss this matter, including whether to file the petition immediately or whether to await the results of her appeal.

> On May 18, 2015, Respondent wrote to Simmons advising he completed the post-conviction petition (Petitioner's Exhibit 74). He also advised that he would await the ruling on the writ before filing the petition for post-conviction relief. By letter dated June 24, 2015 directed to Mr. Braudes, Respondent also represented that he completed the draft of the post-conviction petition (Petitioner's Exhibit 74). On August 13, 2015, Respondent again wrote to Simmons advising he had completed the post-conviction petition (Petitioner's Exhibit 74). Petitioner acknowledged at trial that he had not completed the petition when he made the representation to Simmons in May 2015, when he made the representation to Mr. Braudes in June 2015, or when he made the representation to Simmons in August 2015.

> Clearly Respondent did some work on the file. He met with Simmons in person to discuss the case, contacted her public defender, received and sent out correspondence and reviewed her writ petition. He also prepared a post-conviction pleading. However, the pleading, in the context of the pending appeal and a stay of post-conviction proceedings was of no value, given that Simmons' original conviction was vacated. That the decision to prepare a post-conviction was a sham is further evidenced by Respondent's earlier

representations to both Simmons and Mr. Braudes that he would file the petition after the appeal process was completed. Respondent's post-trial suggestion that the post-conviction petition continues to have value is meritless. The old "grounds" for the post-conviction pleading do not automatically cover Simmons' new plea. However, the court finds Respondent drafted the petition to justify having placed the legal fees in his operating account at the outset, and to justify keeping the entire retainer. Although Respondent contends it was Simmons who insisted he move forward and file so that the post-conviction would be ready to go, the court simply does not find credible that explanation.

*     *     *     *

The court finds the petition was not drafted prior to the time Ray requested a refund, although Respondent lied to his client and to the Public Defender when he represented it had been drafted. The court further finds Respondent rushed to prepare the petition to justify "keeping" all of Ray's funds. Likewise, this court notes Respondent's agreement to represent Simmons at the parole hearing (which he was not permitted to do) and to represent Simmons in her new trial are services not contemplated in the retainer agreement. To the extent Respondent claims there was value in the communications he had with Simmons and the Parole Commission's representative concerning the parole hearing, this court notes a fair amount of Respondent's effort had nothing to do with the post-conviction proceeding.

The hearing judge found that Respondent made several misrepresentations to Ms. Simmons and Ms. Ray, and later to Bar Counsel, after Ms. Simmons terminated her representation with Respondent:

Although the date is unclear, at some point prior to August 20, 2015, Ray requested a refund of the fees paid. Respondent sent a text message to Ray advising he would prepare the bill and issue a refund of all unearned fees from "escrow" (Petitioner's Exhibit 67). On August 25, 2015, Respondent wrote to Simmons to advise her of Ray's request for a refund, to advise that Simmons was in fact the client, and to advise that he would need to charge for his time if representation was terminated (Petitioner's Exhibit 74, letter from Smith to Simmons dated August 25, 2015). The evidence shows that despite his representation to Ray, Respondent never placed Ray's funds in his trust account and, therefore, none of her funds were in the trust account waiting to be disbursed.

18

His letter to Simmons dated August 25, 2015 also shows Respondent had no intention of forwarding the check he referenced in his August 20, 2015 text to Ms. Ray (Petitioner's Exhibit 67). He never prepared a statement of account for Ray as promised. Indeed, the fee dispute between Ray and Respondent was settled through litigation. That Ray was required to engage in litigation confirms for this court Respondent intended to keep every dime of the fees he deposited into his operating account prior to earning any of the fees.

Ms. Simmons requested that Respondent terminate his representation in December 2015. Rather than move to strike his appearance, by letter dated December 5, 2015, Respondent suggested he remained responsible for the case until relieved by the judge of his responsibility. Respondent made no attempt to explain to Simmons his obligation to strike his appearance and did not follow her instructions to do so (Petitioner's Exhibit 74). Rather, while retaining all of her legal fees, he simply instructed her to have new counsel enter an appearance.

In addressing Ray's request for a refund, Respondent prepared an "invoice" through which he claimed his fees totaled $14,350. The court does not find Respondent's statement of account credible as there is no indication Respondent prepared it contemporaneously with the work he allegedly performed. Given the pending appeal, and given his repeated promises that he would not file for post-conviction relief until the appeal was resolved, such a suggestion is nothing more than proof of an unreasonable fee, particularly where Respondent represented at the outset that the case could (and would) be completed for a flat fee of $7,500.

Upon receiving Ray's complaint, in February 2016, Bar Counsel sought information from Respondent. Respondent did not reply to Bar Counsel's inquiry until April 8, 2016 (Petitioner's Exhibit 68 and 71). Respondent's reply referenced billing his time at $450 per hour, a rate that was not only not contemplated but that was expressly excluded from the retainer agreement; thus, it is a misrepresentation of the fee arrangement. Likewise, Respondent misrepresented that he sent all work and billing to the client.

The hearing judge found that Respondent's fees in the Simmons matter were "incredible":

It may be that at an hourly rate of $450 (which some people practicing 40 years can command), given the hours he spent visiting Simmons, reading the transcript and drafting the petition, Respondent's services could have been worth more than $7,500; however, the court finds the Statement of Account incredible. For the court to believe in its veracity, the court would

19

have to believe, among other facts, that Respondent billed his and Mr. Robinson-Bey's time at the same rate, as there is no distinction in the Statement of Account found in Exhibit 74 between their rates.

The hearing judge found that during Bar Counsel's investigation of the Simmons matter, Respondent was evasive with respect to the financial and/or billing statements in that matter:

> Bar Counsel requested further information on April 21, 2016 (Petitioner's Exhibit 72). By letter dated June 10, 2016, Respondent provided a copy of the client file but did not respond to Bar Counsel's request for information pertaining to finances or provide authentic documentation of the dates and times on which he provided services (Petitioner's Exhibit 74). Respondent did not reimburse any of the fees he received to represent Simmons in the post-conviction matter.

Finally, Bar Counsel alleged that Respondent's conduct violated the Maryland Attorneys' Rules of Professional Conduct during his representation of Mr. Kintrell McEachern, who hired Respondent for assistance with both federal and state court matters. The hearing judge made the following factual findings regarding Respondent's representation of Mr. McEachern:

> In 2013, Kintrell McEachern ("McEachern") received a lengthy sentence in Federal Court that he wished to have reduced by collaterally attacking his state court convictions. Through his wife Ronica McEachern, who held a power of attorney to act in his stead (Petitioner's Exhibit 40), McEachern sought out Respondent to file various petitions for *coram nobis* relief in the Baltimore City Circuit Court, to represent him in a case that stemmed from a traffic matter and that allegedly needed to be addressed by Judge Stewart, and in a federal matter. For the *coram nobis* matters, Respondent charged a flat fee of $2,500. Respondent prepared no retainer agreement for the *coram nobis* matters (Petitioner's Exhibit 53). Mrs. McEachern paid Respondent $2,500 for the *coram nobis* proceedings on July 22, 2013. (Respondent's Exhibit 33). Respondent did not deposit the funds into his trust account. Neither did Respondent secure either McEachern's or his wife's consent to forego placing the funds in a trust account.

20

On June 6, 2014, Respondent entered his appearance in the matter (Petitioner's Exhibit 63). There also appears to have been a *pro se* habeas corpus matter pending before Judge White which was denied without a hearing. Respondent filed a request for a hearing on the petition McEachern had already filed (Petitioner's Exhibit 63). Respondent took no further action in the matter as the hearing request was not granted. Respondent appeared to believe the Stewart matter was addressed by Judge Tanner; however, Judge Tanner does not make mention of the traffic matter in her ruling and there is no mention of that in the hearing transcript (State's Exhibit 64) or in Judge Tanner's *coram nobis* ruling.

Respondent filed for *coram nobis* relief, although there was some confusion involved in the case numbers Respondent used in the pleadings. Ultimately, while the errors appear to have caused McEachern and his wife concern, there is no indication the clerical error affected the outcome of the *coram nobis* cases or resulted in the court not considering each *coram nobis* request.

Problems arose with respect to the *coram nobis* cases when the hearing judge failed to promptly issue her ruling, a ruling McEachern was obviously anxious to receive. Respondent wrote to the judge, called the judge's chambers and filed a motion to seek a ruling, all to no avail. Contrary to McEachern's desire, Respondent did not think it wise to pursue mandamus relief (which Respondent prepared for McEachern free of charge but would not file on his behalf) or disciplinary proceedings against the hearing judge and made his position clear in that regard. Respondent's refusal to take those steps caused a break-down in the attorney-client relationship and ultimately led McEachern to terminate Respondent's services, although text messages appear to suggest some back-and-forth on McEachern's desire to have Respondent terminate his services for each of the cases.

The relationship between Respondent and McEachern soured in Spring 2015 for, as was noted above, Respondent did not agree to apply the tactics McEachern wanted used to propel the hearing judge forward. Ultimately, communications between Mrs. McEachern and Respondent led Respondent to limit communication to written communication, as Respondent felt "harassed" and felt that any actions taken by McEachern against the hearing judge would be attributed to Respondent (Petitioner's Exhibit 36, letter from Respondent to Mrs. McEachern). An additional source of irritation among the parties was the fact that Respondent did not provide certain requested federal documents to his wife upon her request, as the documents were sealed.

Although he could not release the sealed documents, Respondent created an expectation that he would supply certain documents after obtaining them through "Pacer," as is reflected in text messages between Respondent and Mrs. McEachern (Petitioner's Exhibit 33). However, he

21

never supplied the documents. As communications soured, Respondent insisted that the McEacherns communicate with him in writing. The court does not find Respondent barred McEachern from **all** communication, however, given the visits Mrs. McEachern made to the office and the frequency and nature of the communications between Mrs. McEachern and Respondent, with escalating behaviors occurring, the court finds Respondent wished to have only written communications with McEachern given the difficulties they were experiencing.

Bar Counsel did not show Respondent, who participated in McEachern's federal case and certainly knew what transpired, was unaware of the fact that certain documents were sealed. The court does find that Respondent ought to have either noted an appeal or ensured McEachern was aware of the date by which he needed to appeal the hearing judge's denial of *coram nobis* relief, ought to have provided to McEachern a copy of the hearing judge's ruling (Exhibit 40, letter to McSpaden), and that upon being requested to do so, Respondent ought to have moved to withdraw his appearance in the open matter in State court and in the Federal matter, rather than relying upon McEachern to file a motion for withdrawal (Petitioner's Exhibit 47).

The court does not find that as a general matter, Respondent failed to adequately communicate with McEachern, either directly or through him or his wife. McEachern was fully aware of the fact that the hearing judge's ruling held up the entire process, and was fully aware of the fact that little could be done to move the federal case forward absent the hearing judge's ruling. Likewise, the court finds Respondent was justified in withholding any sealed documents from Mrs. McEachern and Mr. McEachern as his professional obligation required.

Regarding Respondent's fee arrangement with the McEacherns and the safekeeping of their funds, the hearing judge found that Respondent did not place the funds in escrow and did not maintain an accounting of his time representing Mr. McEachern:

McEachern takes no issue with fees paid to Respondent for handling the *coram nobis* matters (Petitioner's Exhibit 59, letter from his wife dated November 24, 2015).

As to the traffic matter pending in state court, the court is unclear on when Respondent was retained to represent McEachern. However, Respondent was so retained and received a cash payment of $2,500. Respondent contends the fees tendered for this matter totaled $1,500. Respondent provided no retainer agreement for the matter and did not deposit

22

or maintain any of the funds in his trust account, despite not having received consent to bypass the trust account process.

Respondent was also retained to represent McEachern in federal court in the event McEachern succeeded in the *coram nobis* matters. For this matter, McEachern paid $2,500 cash. Again, Respondent contends he charged McEachern $1,500 for the federal court matter. Respondent prepared no retainer agreement and did not place any funds in escrow. The court finds Mrs. McEachern more credible on the amounts Respondent charged McEachern for Respondent's services.

The court does not find credible Respondent's written accounting of time spent representing McEachern (Petitioner's Exhibit 57, letter from Respondent), as there is no indication Respondent records contemporaneously with the services he provided. Rather, at most, this court finds Respondent attempted to "reconstruct" his activities. With regards to the federal matter, the court finds Respondent did what he could to open lines of communication and obtained a commitment from the Assistant United States Attorney assigned to the case to resolve the matter if the *coram nobis* petition was granted. Thus, Respondent did perform some substantive work on the federal case. However, there was not much Respondent could do to advance the federal case absent a ruling from the state court.

The court finds Respondent misrepresented to Mrs. McEachern that legal funds remained in trust when he wrote to her on June 2, 2015 (Petitioner's Exhibit 36). He likewise represented to McEachern that funds remained available when he wrote to McEachern on August 28, 2015 (Petitioner's Exhibit 50). Respondent did not follow through on his promise to send an accounting or to issue a refund. The court is not clear on whether a file exists beyond the documents Respondent filed in court, and, if so, what portion of the file is protected from disclosure. Respondent contends he forwarded his files to McEachern. The court finds Respondent credible in that regard.

The hearing judge found that Respondent's cooperation with Bar Counsel was devoid of a "substantive response":

Upon receipt of a complaint, Bar Counsel undertook an investigation in this matter. On July 8, 2015, Bar Counsel requested a response from Respondent (Petitioner's Exhibits 32 and 35). Respondent did send a reply, but it was not completely responsive (Petitioner's Exhibit 40). Bar Counsel's August 14, 2015 request for the retainer agreement (Petitioner's Exhibit 43) went unanswered until September 21, 2015 (Petitioner's Exhibit 51) and even then, a substantive response was lacking.

By letter dated September 30, 2015, Respondent advised Bar Counsel that there exists no retainer agreement and that no refund would be offered as he earned his fees. (Petitioner's Exhibit 53). In a letter dated October 27, 2015, following docketing of the complaint, Respondent represented to Bar Counsel that McEachern paid him $1,500 for the state matter and $1,500 for the federal matter (Petitioner's Exhibit 57). However, Respondent was unable to provide any details as to receipt or manner of payment. Respondent candidly acknowledged the funds were not placed in his trust account. Respondent never responded to Bar Counsel's November 10, 2015 letter requesting additional information on McEachern's funds (Petitioner's Exhibit 58). He has not returned any fees to McEachern.

Bar Counsel did not produce McEachern for testimony in this matter. The court did not receive his written complaint for the truth of the matters stated therein, but, merely to allow for the court to place Respondent's reply in context. The court had no opportunity to judge McEachern's credibility. The court found Mrs. McEachern to have an aggressive demeanor, some of which may be attributable to the circumstance. However, her manner of testifying tended to support Respondent's concern that she escalated tension in his office. The court found, based on her demeanor, that she behaved in a demanding manner and invited herself to the law office at times and in a manner that suggested she was in control of Respondent and was, in part, responsible for Respondent's desire to communicate in writing rather than in person.

## CONCLUSIONS OF LAW

After detailing these findings of fact, Judge Bryant then determined the following conclusions of law:

### Rule 19-301.1 - Competence

The court finds Respondent is generally competent to handle post-conviction matters in that he possesses the requisite legal knowledge and skill to offer post-conviction services of all types, including services for post-conviction petitions, *coram nobis* petitions, and habeas corpus petitions.

In the Marshall case, the facts of this case reveal Respondent's personal involvement in this case was limited to writing Marshall on one occasion, reading the transcript, directing Mr. Robinson-Bey to read the transcript, discussing with Robinson-Bey the issues that each found lurking in the transcript, directing Robinson-Bey to prepare the transcript and speaking with Marshall on only one occasion.

24

Respondent neither played a role in preparing the petition nor reviewed the petition prior to having it submitted to Marshall. In failing to even read and verify that the petition was court-worthy and that it addressed all issues presented in the transcript, Respondent failed to use his skills and exhibit the thoroughness and preparation his promise of representation required. Moreover, Respondent failed in his duty to competently represent Marshall when he failed to discuss with him the issues to be raised in the case and failed to counsel Marshall regarding Marshall's need to preserve his federal rights by seeking post-conviction relief in timely fashion. Thus, as to his representation of Marshall, Respondent violated Rule 19-301.1.

This court stops short of suggesting Marshall's post-conviction petition itself was meritless. Bar counsel presented no evidence to suggest other issues ought to have been raised and certainly presented no legal expert to opine how the petition ought to have differed from that presented to but rejected by Marshall in December 2014 based on the issues presented at trial. The fact that Marshall and his fellow inmates took a dim view of the petition is insufficient to show in and of itself the petition was inadequate.

Bar Counsel did not demonstrate Respondent violated Rule 19-301.1 in his representation of Simmons and McEachern in terms of the substantive work he offered.

As pertains to Respondent's failure to properly manage Ms. Monroe's funds after depositing them in his trust account, Respondent violated Rule 19-301.1. *Attorney Grievance Comm'n v. Bell*, 432 Md. 542, 554 (2013). Never having bothered to place Simmons' funds and McEachern's funds in his trust account, this court does not conclude Respondent breached 19-301.1 with respect to the handling of their funds.

## Rule 19-301.2 Scope of Representation and Allocation of Authority Between Client and Attorney

Respondent had little communication with Marshall regarding the contents of the petition, failed to read the petition to ensure its contents fairly addressed any potential legal issues to be raised in the post-conviction proceedings, and upon learning Marshall was unhappy with the draft, simply counseled him to file the petition and allow for amendment rather than taking steps to rectify the problem, thereby engendering no confidence in the client. For these reasons, the court finds Respondent violated Rule 19-301.2(a).

The court does not find Respondent violated Rule 19-301.2 as pertains to clients Simmons and McEachern.

25

## Rule 19-301.3 Diligence

The court finds Respondent read Marshall's transcript upon receipt and directed Robinson-Bey to prepare the petition. He began working on the case well in advance of having been paid to represent Marshall. Thus, at the outset, he showed diligence in representing Marshall. However, the court cannot find he diligently represented Marshall as he failed to adequately communicate with Marshall regarding the issues to be raised in the petition. Although Respondent, as counsel, has the right to determine how to accomplish the goal of obtaining post-conviction relief, he still has an obligation to meet with his client, engage in meaningful discourse, and take into consideration the client's position, whether or not the client's issues ever make it into the document.

This court notes as an aside that it is not unusual for counsel and clients to disagree on the scope and contents of the post-conviction pleading, and this court has encountered cases where counsel and the client submitted separate pleadings and offered separate arguments at the post-conviction hearing, counsel having determined that counsel could not, in good faith, offer certain arguments to the court. However, in this case, counsel and Marshall never conferred in any meaningful way that would have permitted Respondent to ensure his course of action met the goals of representation, including, but not limited to filing the petition in a timely fashion to ensure preservation of Marshall's federal rights. Thus, by clear and convincing evidence, Respondent failed to diligently represent Marshall.

This court does not find Respondent violated Rule 19-301.3 as to clients Simmons and McEachern.

## Rule 19-301.4 Communication

Respondent relied almost exclusively on Robinson-Bey to communicate with Marshall, whether directly or through Mr. and Mrs. Monroe. He did not communicate with Marshall in any meaningful way, and acknowledges that at most, he had two conversations with Mr. Marshall, the second of which occurred when Marshall discussed his dissatisfaction with the product. In short, Respondent failed to explain to Marshall the viability of any legal theories to support the petition, failed to discuss Respondent's reasons for offering or not offering various arguments in the initial pleading and failed to discuss with Marshall the need to timely file the post-conviction petition to preserve his federal rights. Moreover, once Marshall expressed displeasure, Respondent merely offered to "amend" the petition later, which suggests either he did not explore every possible issue raised in the transcript or simply was attempting to momentarily appease Marshall. In short, Respondent began to represent Marshall in May 2014. He did not have any

meaningful dialogue with Marshall until December 19, 2014. Clearly and convincingly, Respondent failed to communicate with Marshall, thereby violating Md. Rule 19-301.4(a)(2) and a(3) and Rule 19-301.4(b).

The court finds Respondent failed to comply with Md. 19-301.4(b) when he failed to notify McEachern of the date by which an appeal needed to be filed in the *coram nobi*s matter.

### Rule 19-301.5 Fees

Bar counsel failed to present evidence to show the fee charged for Marshall's post-conviction services was inherently unreasonable or not the customary fee for providing post-conviction services. Given Respondent's years of practice, experience in criminal law, and experience in post-conviction matters generally, $7,500 for representation in a case of this nature is reasonable in this court's judgment. Even billing at $250 per hour, far less than Respondent claims he charges per hour, reading the transcript, conducting the necessary research, drafting the petition and attending the post-conviction hearing would consume a $7,500 fee. That is quite a different issue from whether Respondent personally did work or offered services to support that he earned the fee. In this case, Respondent's fee while reasonable at the outset, became unreasonable as he delegated the work to a non-lawyer and never even bothered to ensure the product adequately addressed issues raised by the transcript, contained correct recitations of the law or contained frivolous arguments.

Respondent received payment for his services on November 26, 2014, months after receiving and reviewing the transcript, and causing Mr. Robinson-Bey to draft the post-conviction petition. The court cannot conclude Respondent personally spent more than a couple hours on this matter and there is no legal justification for charging $5,000 for Robinson-Bey's services. Given the lack of legal services provided by Respondent, the fee charged, and retained was unreasonable and violated Md. Rule 19-301.5(a). *Attorney Grievance Comm'n v. Monfried*, 386 Md. 373, 393 (2002).

Regarding the Simmons matter, the court likewise finds the fees offered became unreasonable after retention, and Respondent therefore violated Rule 19-301.5(a). Respondent clearly did nothing more than visit Simmons and write a couple of dishonest letters prior to being asked to return Ray's money. To the extent he did any heavy lifting, it was after Ray requested return of the money and he needed to justify having placed none of the funds in his trust account and having converted all of Ray's funds to his own use. *Attorney Grievance Comm'n v. Landeo*, 446 Md. 294, 328 (2016).

The court does not find the fees charged in the McEachern case were inherently unreasonable. McEachern had a number of state cases that needed to be addressed and that required a fair amount of wading to conquer. *Coram Nobis* relief is considered extraordinary. The fact that relief was not granted does not mean Respondent did not work on the case or that he did not give value for his services. That is especially true given Respondent's post-argument attempts to secure a ruling, his agreement to draft a writ of mandamus free of charge and the level of communication he maintained with Mrs. and Mr. McEachern.

As to the federal matter, Respondent clearly worked with the Assistant U.S. Attorney in the hopes of resolving the matter. Evidence presented in this case shows Judge Quarles and the Assistant U.S. Attorney understood there was nothing to be done until the state court resolved the underlying convictions. The fees in the federal matter were not inherently unreasonable, but became so when Respondent did little work on the case save communicating with the court and the Assistant United States Attorney on a limited basis, but held no money in his account when he had not advanced the federal matter to any real degree.

The same is true for the traffic matter Respondent became involved in. There is no indication Respondent performed any substantive work that amounted to a $2,500 fee. In fact, the evidence shows Respondent reviewed a *pro se* pleading filed by McEachern and requested a hearing. Thus, Respondent violated Rule 19-301.5(a) in handling two of McEachern's matters.

## Rule 19-301.15 Safekeeping Property

In the Marshall case, the evidence clearly and convincingly demonstrates Respondent received $5,000 on November 26, 2014, and placed the funds in his trust account. He created and/or maintained no records to show where the money went or that he earned the funds he withdrew on short order, even though the post-conviction petition had not been filed and, therefore, the fees had not been fully earned, thereby violating Md. Rule 19-301.15(c). *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 360 (2005). While it is true that the post-conviction petition had been drafted prior to Respondent's receipt of the funds, it is clear Respondent had not even read, much less confirmed the legal value of the petition. The evidence shows work done on this file was done primarily by a non-lawyer assistant whose only legal training appears to have been gained drafting post-conviction petitions while incarcerated. While the court does not find Mr. Robinson-Bey incapable of drafting the petition, the work needed to be vetted by an attorney to ensure the petition was sufficient and covered any issues that should have been apparent from the transcript. Moreover, the fees

28

charged were designed to carry the case to conclusion. No filing had been made and no hearing date had been scheduled; thus, Respondent, having spent little time on the case, cannot be said to have earned $5,000 for his services, even with this court's recognition that Respondent had not received the amount Monroe agreed to pay.

In the Simmons matter, Respondent did not deposit the $7,500 received from Ms. Ray into his trust account . . . a failure that violated Rule 19-301.15(c). He did not earn close to the funds he received and retained, much less before he received payment, and did not return any funds when requested to do so. His only reason for preparing the post-conviction petition was to justify the funds he had already taken.

In the McEachern matter, Respondent never deposited the funds into this trust account, an act that violates Rule 19-301.15(c). Thus, he failed to retain any of the fees in his trust account until he earned the fees as there is no evidence Respondent undertook work for McEachern prior to receiving the funds.

Once a dispute arose as to fees, Respondent failed to keep a portion of any client's funds in his trust account in violation of Md. Rule 19-301.15(e). Indeed, he could not since other than Monroe's funds, Respondent never placed any client's funds in his trust account. Likewise, Respondent failed to meet his obligation to provide an accounting to the clients, a failure that violates Rule 19-301.15(d).

The evidence clearly and convincingly shows Respondent violated Rule 19-301.15(a) in that as to each of the clients, he failed to create and maintain records of having received their funds and disbursed their funds. *Attorney Grievance Comm'n v. Obi*, 393 Md. 643, 657 (2006). Moreover, Respondent used the trust account for personal expenses and allowed the account to fall out of balance, all in violation of Rule 19-301.15. *Attorney Grievance Comm'n v. Glenn*, *supra*, 341 Md. at 448.


### Rule 19-301.16 Declining or Terminating Representation

The evidence clearly and convincingly shows Respondent failed to properly withdraw his appearance in the McEachern matters and in the Simmons matter. Thus, by clear and convincing evidence, Respondent violated Rule 19-301.16(d) when he failed to withdraw his appearance, particularly where he shifted the burden to Simmons to have new counsel enter an appearance.

Additionally, Respondent violated Rule 19-301.16(d) when he failed to protect McEachern's ability to appeal Judge Tanner's denial of *coram nobis* relief. For the reasons discussed in conjunction with its factual findings, the court does not find Respondent violated Rule 19-301.16(d) in failing to turn over papers to either of the McEacherns, as the court cannot

determine whether doing so would have violated Respondent's obligations to the federal bench.

Finally, for the reasons discussed with respect to Rule 19-301.15, Respondent violated Rule 19-301.16(d) when he failed to protect each client's financial interests once the fee dispute arose.

### Rule 19-305.3 Responsibilities Regarding Non-Attorney Assistants

The court finds by clear and convincing evidence Respondent failed to adequately supervise Mr. Robinson-Bey. Respondent essentially directed Robinson-Bey to draft Marshall's petition and allowed the petition to be sent to the client, sight unseen. Respondent did not verify that all potential avenues were pursued and raised in the petition. In short, Respondent had a discussion with Robinson-Bey about issues they each believed were apparent from the transcript, and completely delegated the work to Robinson-Bey. While Respondent is permitted to delegate the work, he is not permitted to completely abrogate his responsibility to the client to ensure that competent legal service is provided as he must ensure Robinson-Bey's conduct is compatible with Respondent's own professional obligations in order to satisfy Rule 19-305.3(a) and 19-305.3(b). Thus, as to the Marshall matter, Respondent violated Md. Rule 19-305.3(a) and (b). The court does not find by clear and convincing evidence that Mr. Robinson-Bey provided legal advice to Marshall or to the Monroes; thus, the court does not find by clear and convincing evidence that Respondent violated Rule 19-305.3(c).

The court does not find Respondent violated Rule 19-305.3 regarding the McEachern matter.

### Rule 19-308.1 Bar Admission and Disciplinary Matters

The court finds by clear and convincing evidence Respondent violated Rule 19-308.1(a) in that he knowingly presented false information to Bar Counsel in addressing Bar Counsel's inquiries. In particular, as outlined in the court's factual findings, Respondent offered false statements of account, attempted to mislead Bar Counsel regarding the status of his trust account in his written narratives and falsely represented the work he did in both the Marshall and Simmons case.

This court also finds that Respondent knowingly failed to respond to Bar Counsel's inquiries fully as pertains to his trust account and the handling of each client's funds. Moreover, what information Respondent did provide, he failed to disclose in a timely fashion. Thus, by clear and convincing evidence, based on actions outlined in this court's factual findings, Respondent violated Rule 19-308.1(b).

**Rule 19-308.4 Misconduct**

This court finds by clear and convincing evidence that Respondent violated Rules 19-308.4(a), 19-308.4(c), and 19-308.4(d) as to each of the clients. The court does not find Respondent violated Rule 19-308.4(b) as to McEachern and Marshall as Respondent did perform work for the clients. He did not merely take the clients' money and run. So while the amount of work, the nature of the work, and the timing of the work might be suspect, Respondent's conduct does not rise to the level of criminality or direct misappropriation. Rather, Respondent's conduct appears to be borne of sloppiness and delegating responsibilities to others, as well as sloppy record-keeping and perhaps not having a clear understanding of the need to handle monetary matters formally and not casually.

Respondent did violate Rule 19-308.4(b) in the Simmons matter. He deliberately lied about having prepared the post-conviction petition earlier than he did and only prepared the document when he did to justify retaining the legal fees.

For reasons addressed, Respondent engaged in misconduct that violates Rule 19-308.4(a) by virtue of having violated multiple Rules of Professional Conduct as otherwise discussed herein. *Attorney Grievance Comm'n v. Cherry-Mahoi*, 388 Md. 124, 159 (2005). Respondent engaged in acts of dishonesty in representing he did work he did not actually perform, lied about the timing of work performed, lied about having maintained clients' funds in his trust account and in attempting to mislead Bar Counsel when responding to various inquiries. Moreover, Respondent violated Rule 19-308.4(c) when he created false billing statements, suggested to his clients that they "owed" him money based upon billed hours after undertaking representation on a flat fee basis, and attempted to mislead Bar Counsel regarding the status of his trust account.

The court finds Respondent's conduct, taken as a whole, is prejudicial to the administration of justice and therefore violates Rule 19-308.4(d). Indeed, as a result of Respondent's conduct, McEachern was deprived of a timely appeal from Judge Tanner's denial of *coram nobis* relief and Marshall lost his ability to seek federal habeas corpus relief. And in terms of his handling of the client funds, including, but not limited to using trust funds for personal expenses, Respondent, through his conduct, engaged in behavior that tended to bring the legal profession into disrepute. *Attorney Grievance Comm'n v. Tanko*, 427 Md. 15, 55 (2012); *Attorney Grievance Comm'n v. James*, 385 Md. 637, 649-50 (2005); *Attorney Grievance Comm'n v. Sweitzer*, 452 Md. 26, 43 (2017).

31

### Rule 19-404 Trust Account – Required Deposits

By clear and convincing evidence, Respondent violated Rule 19-404 when he failed to deposit Ray's funds into his trust account, even though he charged on a flat fee basis, as he had not earned any of the fees upon receipt. *Attorney Grievance Comm'n v. Zuckerman*, *supra*, 386 Md. at 360. The full flat fee is not earned until work associated with the assignment is completed. *Id*. *See also*, Md. Code, BOP § 10-304, which requires an attorney to place all money held in trust, including advance fee payments, into the trust account. *Attorney Grievance Comm'n v. McLaughlin*, 372 Md. 467, 504 (2002).

### Rule 19-407 Attorney Trust Account Record-Keeping

Respondent did not create and maintain records as required by Rule 19-407 as to funds received from Ms. Monroe and deposited into his trust account. He produced no records in response to Bar Counsel's requests for information on his trust account save the one record he sent to try to suggest he had Ms. Monroe's funds remaining in his account, and produced to the court no documents to demonstrate he maintained records of deposits or disbursements, or that he reconciled the trust account statements at any time. Thus, Respondent clearly and convincingly violated Rule 19-407(a)(2)(A) and (a)(2)(B), 19-407(a)(3)(A) and (a)(3)(B) and 19-407(b).

### Rule 19-408 Comingling of Funds

For reasons discussed in the factual findings, by clear and convincing evidence, at the time he represented clients McEachern and Marshall, Respondent violated Rule 19-408 when he disbursed client funds to himself and/or to his church and for other reasons such as copier fees. *Attorney Grievance Comm'n v. James,* 428 Md. 457, 468 (2012). Additionally, Respondent violated this Rule when he deposited money from unknown or unidentified sources into the trust account and those funds were not associated with any particular client matter.

### Rule 19-410 Prohibited Transactions

By clear and convincing evidence, Respondent's trust account fell out of balance with respect to five different clients during his representation of the three clients who are the subject of these proceedings. Moreover, Respondent's trust account fell out of balance generally. Thus, Respondent is in violation of Rule 19-410(c).

## DISCUSSION

### Standard of Review

In *Attorney Grievance Comm'n v. Hamilton*, we articulated the standard of review

for attorney discipline matters:

> The Court of Appeals has original and complete jurisdiction over attorney discipline proceedings. We generally will accept the hearing judge's findings of fact, unless those findings are clearly erroneous. The hearing judge's conclusions of law do not receive the same deference as his or her fact findings. [Ultimately,] [w]e review the hearing judge's legal conclusion without deference, pursuant to Md. Rule [19-741(b)(1)].

444 Md. 163, 178, 118 A.3d 958, 966 (2015) (internal citations and quotations omitted).

### **Respondent's Contentions Other Than Exceptions**

Respondent noted timely exceptions and contentions to almost all of the hearing

judge's conclusions of law and to some of her findings of facts.

Respondent contends that the hearing judge erred in admitting the deposition of

DaJuan Marshall under Maryland Rule 2-419. Pursuant to Md. Rule 2-419(a)(3)(C), "the

deposition of a witness, whether or not a party, may be used by any party for any purpose

against any other party who was present or represented at the taking of the deposition or

who had due notice thereof, if the court finds that the witness is unable to attend or testify

because of age, mental incapacity, sickness, infirmity, or imprisonment." Respondent

contends that, although Mr. Marshall was incarcerated in Cumberland, Maryland, he was

not unavailable to participate in the hearing. Bar Counsel contends that the

communications regarding the deposition's date and time provided Respondent due notice

33

under the rules. At the hearing, when Respondent objected to the use of Mr. Marshall's deposition, the hearing judge explained that:

> Rule 2-411 indicates that, any party may cause the testimony of a person to be taken by deposition for the purpose of discovery or of use as evidence in action for both purposes. Leave of court must be obtained to take the deposition of a person who is confined in prison. Bar counsel did not seek leave of court before noting the deposition.
>
> Rule 2-412 provides, a party desiring to take a deposition shall serve notice of the deposition and shall state the time and place for taking the deposition and the name and the address of the person to be examined. If the deposition is to be recorded by the electronic, audio or audio-video means, the Notice shall specify the method of the recording.
>
> \* \* \* \*
>
> Maryland Rule 2-419 provides, a party may use a deposition transcript and any correction sheets to contradict or impeach the testimony of a deponent as a witness. The deposition of a party or anyone who at the time of taking the deposition was a manager, director, et cetera of a corporation may be used by an adverse party for any purpose.
>
> (A)(3) provides, the deposition of a witness whether or not a party, may be used by any party for any purpose against any other party who was present or represented at the taking of the deposition or who had due notice thereof if the Court finds (1) that the witness is dead; (2) that the witness is out of the state; (C) that the witness is unable to attend or testify because of age, mental incapacity, sickness, infirmity, or imprisonment; (D) that the party offering the deposition has been unable to procure the attendance of the witness by subpoena, or (E) upon motion and reasonable notice that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court to allow the deposition to be used.
>
> There is no question that Bar Counsel failed to seek leave of Court prior to taking the deposition. There's no question that trial counsel did not provide a Deposition Notice and certainly did not meet the requirements of section (B) of Rule 2-412 by designating that this would be a recording in accordance with Maryland Rule 2-419(A)(4).
>
> It seems to me that in this case, the ball was dropped between Counsel in a sense that when Mr. White was asked to attend the deposition, he was not notified or did not understand that it would be a *de bene esse* deposition for use at trial. . . . I'm kind of concerned that Bar Counsel, who is bringing charges did not follow the law to the letter.

34

I don't know that the Defense was necessarily blindsided as much as it was unprepared to participate in a *de bene esse* deposition that had been scheduled. And so I find that under "(E)," exceptional circumstances exist as to make it desirable and in the interest of justice to allow the use of the deposition.

*     *     *     *

So, I recognize that Bar Counsel did not follow the letter of the law by failing to seek leave of court, the likelihood is that leave of court would have been granted, and given the fact that even though there was no written notice, Counsel was certainly on notice that this would be a *de bene esse* deposition. The course of dealings between the parties suggest that everybody understood Mr. Marshall would appear by videotape, so I'm going to allow its use.

We acknowledge that the hearing judge concluded that exceptional circumstances existed to permit the use of the deposition, even though Bar Counsel did not provide formal notice to Respondent or apply for leave of court. We conclude that the hearing judge did not abuse her discretion by allowing the use of the deposition at trial because Mr. Marshall was incarcerated and pursuant to Maryland Rule 2-419(A)(3)(c), incarceration is a circumstance under which a deposition will be permitted to be presented at trial.

Respondent contends that the hearing judge erred in allowing Bar Counsel to ask leading questions during the examination of Respondent. He also contends that the hearing judge erred in admitting text messages and documents regarding the McEachern matter. He does not offer any legal arguments to support his contentions, however. Thus, we do not see any merit in either of these contentions.

### Respondent's Exceptions to Findings of Facts

Respondent noted several exceptions to the hearing judge's factual findings.

35

*Exceptions Regarding Mr. DaJuan Marshall*

Respondent excepts to the hearing judge's finding that Respondent failed to communicate with Mr. Marshall, and earn all fees associated with the case. Respondent asserts that he read the transcript, researched case law, and prepared the petition for Mr. Marshall. He also asserts that he discussed the transcript and the petition with his paralegal, Mr. Robinson-Bey. The hearing judge found that Respondent had two instances of communication with Mr. Marshall over the course of seven months. One of those instances occurred before Respondent even had access to his client's full record. For example, to account for his communication with Mr. Marshall, Respondent provided Bar Counsel with one letter dated May 1, 2014, in which he stated that he had discussed potential issues that could be raised in Mr. Marshall's post-conviction petition but also stated that he had not yet received the transcript. By any measure, it cannot be said that this communication with the client was meaningful because his assertions to his clients were pure speculation. The next time Respondent spoke with Mr. Marshall was in mid-December 2014, just days before the filing deadline for the post-conviction petition. Mr. Marshall acknowledged that he received two letters from Respondent and spoke with Respondent's paralegal regarding the substantive issues of his case. Thus, Respondent did communicate with Mr. Marshall; however, the only "meaningful dialogue" between Respondent and Mr. Marshall occurred just days before the filing deadline. By then, it was too late for Respondent to adequately address his client's concerns, questions, or misgivings about the draft petition. Accordingly, we hold that the hearing judge was not clearly erroneous in her finding. The exception is overruled. *See Attorney Grievance Comm'n v. Lee*, 393 Md. 385, 408, 903

A.2d 360, 374 (2006) (holding that an attorney violated what is now known as Rule 19-301.4(a) when he failed to respond promptly or meaningfully to many of his client's inquiries).

Respondent excepts to the hearing judge's finding that Respondent failed to properly supervise employees and, similarly, that Respondent delegated the bulk of the work to Mr. Robinson-Bey. In an email to Bar Counsel, Respondent described Mr. Robinson-Bey's work as the following: "As my law clerk, Mr. Robinson-Bey has been supervised by me in the reading, analyzing, researching, writing and contacts with inmates and their families in post-conviction cases. . . . I bill for his services and provide him a job in the interest of justice, fairness, and practicality." Despite Respondent's characterization of Mr. Robinson-Bey's role in his law office, clear and convincing evidence indicated that Respondent did not properly supervise Mr. Robinson-Bey's work. For example, the time sheets Mr. Robinson-Bey submitted showed that he completed work *after* Mr. Marshall terminated Respondent's services. According to these time sheets, Mr. Robinson-Bey drafted the Marshall petition through the second week of January 2015, even though Mr. Marshall testified that he had received the petition on or around December 19, 2014, and had terminated representation on December 22, 2014. The hearing judge found that due to the inconsistency in dates regarding termination and the hours spent on the case, Mr. Robinson-Bey's timesheets were fabricated. The hearing judge considered that Mr. Robinson-Bey's failure to contemporaneously keep a record of his time spent on the matter contributed to the inconsistencies. Mr. Robinson-Bey's retroactive and inaccurate

37

timekeeping clearly indicated that Respondent failed to supervise his employees. We overrule this exception.

We overrule Respondent's exception to the finding that he delegated the bulk of the work to Mr. Robinson-Bey. The hearing judge found that Respondent did not personally prepare or revise Mr. Marshall's draft post-conviction petition, but, more importantly, he did not even read the post-conviction petition before submitting it to the client for review. Further, the hearing judge found that Respondent was rarely the one who provided information to the client and that Mr. Robinson-Bey, more than Respondent, was the primary contact person for the client. Finally, Respondent did not provide any records that would indicate that his work on the matter exceeded two letters and one review of the transcript.

Respondent excepts to the hearing judge's finding that he failed to read the Marshall petition. In his deposition, Mr. Marshall stated that Respondent admitted to not reading the post-conviction petition. The Respondent neither testified nor presented evidence to the contrary. We overrule this exception.

Respondent excepts to the finding that Respondent failed to properly advise Mr. Marshall on the preservation of his right to file a federal habeas corpus petition.[17] In his

---

[17] 28 U.S.C. § 2244(d) provides that:
    (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of-
        (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
        (B) the date on which the impediment to filing an application created
        (continued . . .)

deposition, Mr. Marshall stated that during his telephone conversation with Respondent on or around December 20, 2014, Respondent advised Mr. Marshall to file the "skeleton" petition "in court to stop [sic] the toll." Mr. Marshall also testified that Respondent urged him to file the petition and that he could amend it later. Respondent's insistence that Mr. Marshall file the petition evidences Respondent's efforts to satisfy the filing deadline and to address the issue of limitations. Respondent produced a petition and gave it to Mr. Marshall to review before the tolling expired. Mr. Marshall, however, relied on the legal advice of his cellmates—none of whom were practicing attorneys—and decided not to file the petition. The record reveals that Mr. Marshall was aware of the tolling and filing requirements for filing a federal habeas corpus petition when he wrote Respondent telling him not to file the petition. We, therefore, sustain the exception.

---

(. . . continued)

> by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>  (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Respondent excepts to the finding that he formulated bills for services to "support his receipt, maintenance, or disbursement," of the funds paid for Mr. Marshall's representation. On March 3, 2015, Respondent received, by letter, a request for a refund of Mr. Marshall's $5,000 retainer. On June 3, 2015, after Bar Counsel initiated an investigation, Respondent replied to the letter with a statement of the Marshall account. In his reply, Respondent included a bill for services, which indicated that Respondent had spent eight hours at a rate of $450 per hour working on Mr. Marshall's case, and that Mr. Robinson-Bey had spent a total of 110 hours at a rate of $75 per hour working on the case. Accordingly, the fees associated with these hours totaled $11,855.00. In this "bill for services," Respondent indicated that in January 2015, he completed work on the Marshall case. Mr. Marshall, however, had terminated representation in December 2014. The discrepancy between the date that Respondent performed work and the date that Mr. Marshall terminated representation was also reflected in Mr. Robinson-Bey's account of his time spent on the matter, which the hearing judge found to be fabricated. The bill also purports to show that Respondent spent two hours reviewing the petition. Respondent, however, admitted to Mr. Marshall that he had not even read the petition. These inconsistencies in Respondent's bill establish, by clear and convincing evidence, that the bill included false accounts of the hours spent on the matter. These discrepancies, coupled with Respondent's statement that, "it is evident that the time spent in this matter far exceeds your $5,000 retainer charged as a flat fee, and that the funds remained in escrow," demonstrate that Respondent relied upon false accounting records to justify his retention of the retainer fee. We overrule this exception.

40

*Exceptions Regarding Mr. Kintrell McEachern*

Respondent excepts to the hearing judge's finding that Respondent failed to do substantive work on the matters regarding Mr. McEachern. We overrule this exception because the hearing judge declared in her findings that, "Respondent did perform *some* substantive work on the federal case. However, there was not much Respondent could do to advance the federal case absent a ruling from the state court." (emphasis added). Thus, the exception is without merit, and therefore overruled, because the hearing judge never made the finding that respondent failed to perform any substantive work.

Respondent excepts to the finding that he failed to withdraw his appearance from Mr. McEachern's federal case. It appears that the last communication between Respondent and the McEacherns occurred on June 3, 2015, when Mr. McEachern contacted Respondent requesting that Respondent revise the writ of mandamus that Mr. McEachern had received the day before. At that time, Mr. McEachern's federal matter had yet to be resolved. On July 8, 2015, Mr. McEachern filed a *pro se* motion to stay his federal case. In a letter dated July 8, 2015, Petitioner notified Respondent that the McEacherns had filed a complaint with the Attorney Grievance Commission. On August 21, 2015, Mr. McEachern petitioned the United States District Court for the District of Maryland requesting that Respondent's appearance be withdrawn as counsel in Mr. McEachern's federal case. Respondent neither produced records of any work on the federal case after June 16, 2015, nor did he produce any records of an attempt to strike his appearance in the federal matter. It is clear from the evidence that Respondent could not have thought he

was obligated to continue representation in the federal case, and, thus, he needed to withdraw his appearance. We, therefore, overrule this exception.

Respondent excepts to the finding that Respondent created an expectation that he would supply Mr. McEachern sealed documents[18] with regard to his federal criminal case. Respondent created this expectation when he told the McEacherns that he would get his secretary to "get them the federal information[.]" Respondent even created an expectation that the sealed federal documents were obtainable when he told the McEacherns that they would have to get the documents from the federal case on their own, yet failed to inform them that the documents were sealed. We overrule this exception.

*Exceptions Regarding Ms. Simmons*

Respondent excepts to the hearing judge's finding that Respondent did "nothing more than visit Ms. Simmons and write a couple of dishonest letters prior to being asked to return Ms. Ray's money." Respondent asserts that he read the transcript as well as met and communicated with Ms. Simmons. Because Petitioner did not prove by clear and convincing evidence that Respondent failed to read the transcript, we sustain the exception.

---

[18] It is unclear what documents the McEacherns were seeking to obtain as the record did not provide us with the specifics of the sealed documents and the McEacherns' requests for the information were equally vague.

42

Rule 19-301.1 – Competence

Respondent excepts to the hearing judge's conclusion that he violated Rule 19-301.1 in regard to the Marshall matter. Judge Bryant found that:

> In failing to even read and verify that the petition was court-worthy and that it addressed all issues presented in the transcript, Respondent failed to use his skills and to exhibit the thoroughness and preparation his . . . representation required. . . . Respondent failed in his duty to competently represent Marshall when he failed to discuss with him the issues to be raised in the case and failed to counsel Marshall regarding Marshall's need to preserve his federal rights by seeking post-conviction relief in a timely fashion. Thus, as to his representation of Marshall, Respondent violated Rule 19-301.1.

Evidence of a failure to apply the requisite thoroughness and/or preparation in representing a client is sufficient alone to support a violation of Rule 19-301.1. *Attorney Grievance Comm'n v. Garrett*, 427 Md. 209, 222, 46 A.3d 1169, 1177 (2012). Moreover,

> Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake.

*Attorney Grievance Comm'n v. Mooney*, 359 Md. 56, 74, 753 A.2d 17, 26 (2000). Mr. Marshall's potential post-conviction relief was at stake, yet Respondent failed to even read the petition that his legal assistant drafted prior to sending the petition to his client. That

---

[19] Respondent does not cite to any case law as support for any of his exceptions. Nonetheless, we explore the legal validity of Respondent's exceptions to the hearing judge's conclusions of law, despite the absence of any persuasive guidance to support his arguments.

the petition was never filed because Mr. Marshall was so displeased with the product does not alter Respondent's obligations under the Rule. Moreover, Respondent had no intention of reading the petition before he filed it, as he advised Mr. Marshall to allow him to file the petition "as-is" and amend it later. Finally, despite Mr. Marshall's repeated attempts to contact Respondent, Respondent failed to discuss the substantive issues to be raised in the petition with Mr. Marshall.

The hearing judge also found that Respondent, in regard to the Marshall matter, violated Rule 19-301.1 by failing to properly manage Ms. Monroe's funds in his trust account. An attorney demonstrates incompetence, and therefore violates Rule 19-301.1, when he fails to properly maintain his client trust account. *Attorney Grievance Comm'n v. Bell*, 432 Md. 542, 552, 69 A.3d 1040, 1046 (2013). Mr. Marshall's mother, Ms. Monroe, paid Respondent's retainer fee of $5,000 on November 26, 2014, which was deposited into Respondent's trust account on December 1, 2014. On December 4, 2014, Respondent withdrew $500 from his trust account and subtracted that amount from Mr. Marshall's ledger. Ten days later, Respondent withdrew $300 from his trust account and subtracted that amount from Mr. Marshall's ledger. On December 23, 2014, three days after Mr. Marshall sent a letter requesting Respondent not to file the post-conviction petition, Respondent withdrew $2,500 from his trust account and subtracted that amount from Mr. Marshall's ledger. Therefore, $1,700 of Mr. Marshall's funds should have remained in Respondent's trust account. However, in June 2015, Respondent's trust account had a negative balance of –$372.90. The fact that Respondent's trust account had a negative balance, when only a portion of the fees paid for Mr. Marshall's representation were

44

withdrawn, is a clear indication that Respondent failed to properly maintain his client trust account.

We overrule Respondent's exception.

## Rule 19-301.2(a) – Scope of Representation

Respondent excepts to the hearing judge's conclusion that Respondent violated Rule 19-301.2(a). We have articulated a lawyer's duty under Rule 19-301.2:

> In order for a lawyer to abide by a client's decisions concerning the objectives of the representation, the client must be able to make informed decisions as to the objectives of the representation. In order for a client to make informed decisions as to the objectives of the representation, an attorney must give the client honest updates regarding the status of his or her case.

*Attorney Grievance Comm'n v. Shapiro*, 441 Md. 367, 380, 108 A.3d 394, 402 (2015); *see Attorney Grievance Comm'n v. Fox*, 417 Md. 504, 531, 11 A.3d 762, 777 (2010) (holding that an attorney was in violation of Rule 19-301.2 when he "took only *de minimis* steps" to advance his client's goals). Here, although Mr. Marshall repeatedly requested that Respondent include certain legal issues in the post-conviction petition, Respondent failed to include the issues or even discuss the merits of including those issues in the petition. Without any meaningful discussion of his concerns, Mr. Marshall could not make an informed decision as to the objectives of the representation. We, therefore, overrule this exception.

## Rule 19-301.3 – Diligence

Respondent excepts to the hearing judge's finding that he violated Rule 19-301.3 during his representation of Mr. Marshall. Rule 19-301.3 states that "a lawyer shall act

with reasonable diligence and promptness in representing a client. When an attorney does nothing whatsoever to advance the client's cause or endeavor, or fails to disburse funds to clients in a timely manner, the attorney violates MLRPC [19-30]1.3." *Attorney Grievance Comm'n v. Brigerman*, 441 Md. 23, 36, 105 A.3d 467, 474 (2014) (internal citations omitted). In *Attorney Grievance Comm'n v. Shuler*, we held that Ms. Shuler was in violation of what is now known as Rule 19-301.3 after she failed to meet and discuss the steps required for her client's post-conviction relief. 454 Md. 200, 212, 164 A.3d 209, 216 (2017), reconsideration denied (Sept. 21, 2017). In that case, we held that Ms. Shuler's single phone conversation with her client over the course of a lengthy representation period demonstrated a violation of Rule 19-301.3. *Id.* at 223, 164 A. 3d at 222.

Respondent asserts that he engaged in meaningful discourse via letter and that "there was no evidence that he failed to respond to a request [for] information from Mr. Marshall." In a letter addressed to Mr. Marshall, dated May 1, 2014, Respondent stated:

> We are still waiting for the transcript. The first issue seems to be ineffective assistance so called going stature. [sic] CL §9-804. The evidentiary issue seems to have been a matter for the jury since a member of the gang testified that you were involved in the robbery; however, the timing of the two acts give[s] me some concern as to predicate offenses. The introduction of your first trial testimony in the second is most troubling, but the appellate court decided it.

> Yes, the MPJI 3-232 instruction should have been given in a modified version to cover the § 9-804 issue. I believe this would have been the better course and thusly another *Strickland* issue. Please send me your other points.

The May 2014 letter is the only indication of diligent communication between Respondent and Mr. Marshall and it occurred before Respondent had the opportunity to

review the transcript, the very source of information that would shape the scope of the petition. The next time Respondent communicated with Mr. Marshall was in December 2014, just days before the petition's filing deadline. Therefore, we agree with the hearing judge that Respondent "never conferred in any meaningful way that would have permitted Respondent to ensure his course of action met the goals of representation." We overrule the exception.

Rule 19-301.4 – Communication

Respondent excepts to the hearing judge's conclusion that he violated Rules 19-301.4(a)(2), 19-301.4(a)(3), and 19-301.4(b). Rule 19-301.4(a) requires an attorney to keep a client reasonably informed about the status of his or her case and to promptly comply with reasonable requests for information. *See Attorney Grievance Comm'n v. Barton*, 442 Md. 91, 116, 110 A.3d 668, 682 (2015) (holding that the attorney violated Rule 19-301.4 when she failed to adequately communicate with her clients and did "not keep her clients informed regarding the status of their case or respond to their attempts to communicate with her"). Here, Respondent almost exclusively relied on his legal assistant to communicate with Mr. Marshall, and Respondent failed to adequately discuss the legal theories of the petition with Mr. Marshall. In fact, Respondent's failure to communicate with Mr. Marshall, and thus his failure to produce a work-product that met his client's expectations, resulted in Mr. Marshall's dissatisfaction to such a degree that he apparently forfeited his post-conviction rights. We overrule this exception.

Respondent did not except to the hearing judge's finding that he violated Rule 19-301.4(b) in the McEachern matter.

## Rule 19-301.5 Fees

Respondent excepts to the court's conclusion that he violated Rule 19-301.5 in regard to his representation of Mr. Marshall, Ms. Simmons, and Mr. McEachern. "An advance fee given in anticipation of legal service that is reasonable at the time of the receipt can become unreasonable if the attorney does not perform the services expected." *Attorney Grievance Comm'n v. Barton*, 442 Md. 91, 131, 110 A. 3d 668, 691 (2015). In regard to all of the matters, Respondent asserts that he "read the transcript at least twice and drafted the petitions."

As to the Marshall matter, the hearing judge found that "Respondent's fee, while reasonable at the outset, became unreasonable as he delegated the work to a non-lawyer and never even bothered to ensure the product adequately addressed issues raised by the transcript . . . [and that] Respondent personally spent [no] more than a couple hours on this matter and there is no legal justification for charging $5,000 for his legal assistant's services." We agree. "[A] fee arrangement is unreasonable if the attorney fails to perform any meaningful work on behalf of the client in exchange for the fee." *Attorney Grievance Comm'n v. Chapman*, 430 Md. 238, 275, 60 A.3d 25, 48, *reinstatement granted sub nom*. 434 Md. 317, 75 A.3d 321 (2013) (holding that an attorney was in violation of Rule 19-301.5 due to his failure to provide the legal services outlined in his retainer agreement and where the majority of the work for his client was completed by a non-lawyer).

With respect to the McEachern matter, the hearing judge found that the fees in the McEachern federal matter "were not inherently unreasonable, but became so when Respondent did little work on the case save communicating with the court and the Assistant

United States Attorney ("AUSA") on a limited basis, but held no money in his [trust] account when he had not advanced the federal matter to any real degree." Communicating with the Court and the AUSA regarding the status of Mr. McEachern's pending state case required no legal work. In the McEachern traffic matter, for which Respondent charged a flat fee of $2,500, Respondent merely reviewed a *pro se* pleading filed by Mr. McEachern and requested a hearing.

With regard to the Simmons matter, the hearing judge found that Respondent did nothing more than visit Ms. Simmons and write a couple of dishonest letters prior to being asked to return the retainer fee. When Respondent began representing Ms. Simmons, her petition for writ of certiorari was pending before this Court. Upon receiving notice that we granted her petition, Respondent agreed to complete the post-conviction petition after we rendered our decision. In February 2016, we remanded Ms. Simmons' case, obviating the need for a post-conviction petition. The post-conviction petition that Respondent filed in September 2015, therefore, was superfluous. According to the hearing judge, Respondent only completed the post-conviction petition after Ms. Ray requested a refund, and that he did so to justify his failure to place any of the funds in his trust account.

We, therefore, overrule Respondent's exception with respect to the Marshall, McEachern and Simmons matters.

Collective Exception to Various Rules

Respondent excepts to Rules 19-301.15, 19-301.16, 19-305.3, 19-308.1, 19-308.4, 19-404, 16-404, 19-407, 19-408, 19-410, "for reasons already discussed." He adds that "he understands that money received and not earned must go into a trust account."

49

According to Respondent, "putting the money retained from the Simmons case into his operating account was a simple mistake." He goes on to say that "any violations of the trust account must be corrected moving forward." In his short discussion of the above exceptions, Respondent notes that he always responded to Bar Counsel and that Bar Counsel always received whatever was in his file.[20]

Respondent does not cite any case law or the record to support his exceptions to the hearing judge's conclusions of law. Our review of relevant case law and the record require us to overrule Respondent's collective exception to MARPC Rules 19-301.15, 19-301.16, 19-305.3, 19-308.1, 19-308.4, 19-404, and Maryland Rules 16-404, 19-407, 19-408, and 19-410.

## Sanction

The purpose of sanctioning an attorney has never been to punish the attorney but "to protect the public, to deter other lawyers from engaging in violations of the Maryland Rules of Professional Conduct, and to maintain the integrity of the legal profession." *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 375, 872 A.2d 693, 713, *reinstatement granted sub nom*. 387 Md. 326, 875 A.2d 132 (2005). To that end, we impose sanctions "that are commensurate with the nature and gravity of the violations and the intent with which they were committed." *Id*. The appropriate sanction for a violation of the MARPC depends on the facts and circumstances of each case, including consideration of any mitigating factors." *Id*.

---

[20] It is unclear as to what Rule Exception Respondent is addressing with this statement.

50

In *Attorney Grievance Comm'n v. Allenbaugh*, 450 Md. 250, 277, 148 A.3d 300, 316 (2016), we explained that among the factors that this Court considers in fashioning an appropriate sanction for a lawyer's misconduct, aggravating factors include:

(1) prior attorney discipline;
(2) a dishonest or selfish motive;
(3) a pattern of misconduct;
(4) multiple violations of the MLRPC [now MARPC];
(5) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with [rules or orders of the disciplinary agency];
(6) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding;
(7) a refusal to acknowledge the misconduct's wrongful nature;
(8) the victim's vulnerability;
(9) substantial experience in the practice of law;
(10) indifference to making restitution or rectifying the misconduct's consequences;
(11) illegal conduct, including that involving the use of controlled substances;
and (12) likelihood of repetition of the misconduct.

*Id.* at 277–78, 148 A.3d 300, 316–17.

The hearing judge included in her findings of fact and conclusions of law a consideration of any mitigating or aggravating factors. Respondent presented no affirmative defenses, disability or evidence of mitigation. Thus, Judge Bryant found the following aggravating factors: Respondent had one prior disciplinary action; "Respondent operated with a selfish motive in spending his clients' money before he either earned the money or produced a useful product that proved satisfactory or beneficial to the client;" Respondent demonstrated a "pattern of mismanaging his trust account" based on the fact that ledgers for multiple clients were "out of balance" on several occasions and that he "commingled funds on more than one occasion"; Respondent knowingly submitted false

51

time sheets and knowingly made false statements to Bar Counsel, which were made "in an effort to justify his actions and in an effort to mislead both his clients and Bar Counsel"; and Respondent refused to acknowledge any wrongdoing.

Judge Bryant considered the victims' vulnerability, and concluded that:

The clients' vulnerability ranges in these consolidated cases from a party who appears to have had multiple contacts with the criminal justice system (McEachern) to a party with very limited experience in the justice system (Simmons). Each relied upon Respondent's reputation as they understood it and trusted him to operate in their best interests.

Additionally, the hearing judge concluded that Respondent's forty years of substantial experience in the practice of law was an aggravating factor. *See Attorney Grievance Comm'n v. Mininsohn*, 380 Md. 536, 576, 846 A.2d 356, 376 (2004) (noting that an attorney with over two decades of experience at the bar has "substantial experience in the practice of law"). According to Judge Bryant, "Respondent['s] ample time to understand the nature of his obligations, particular[ly] in regard [to] his trust account," was an aggravating factor.

Notably, the hearing judge found that Respondent did not testify untruthfully. She attributed Respondent's lack of responsiveness to Bar Counsel and his inability to recall details during his testimony to:

A lack of documentation, a lack of systems, and delegation of too much authority to subordinates, such as relying upon staff to manage files and manage client communications. The lack of file notes, a system for retaining call logs, text logs and messages, emails and the like necessarily places an attorney in the position of not being able to answer questions with specificity, as most would require documentation to answer fact-specific questions.

Petitioner has asked this Court to disbar Respondent. Respondent, on the other hand, has suggested that the appropriate sanction is a "30-day suspension, during which, Respondent will take a class on handling funds as well as purchase a client management system."[21] We believe disbarment is the appropriate sanction.

In *Attorney Grievance Comm'n v. Vanderlinde*, we articulated our admonishment of attorneys who engaged in deceitful behavior to the detriment of the public:

> Upon reflection as a Court, in disciplinary matters, we will not in the future attempt to distinguish between degrees of intentional dishonesty based upon convictions, testimonials or other factors. Unlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character.
> Disbarment ordinarily should be the sanction for intentional dishonest conduct.

364 Md. 376, 418, 773 A.2d 463, 488 (2001).

Dishonest conduct reflects a range of acts, from misappropriation of funds to misrepresentations to a client, Bar Counsel, or the court. Generally, the sanction of disbarment is appropriate when an attorney has acted with intentional dishonesty in violation of Rule 19-308.4(c), absent extenuating circumstances. *See id; see also Attorney Grievance Comm'n v. Thomas*, 445 Md. 379, 402, 127 A.3d 562, 576 (2015) (holding that disbarment was the only appropriate sanction where an attorney violated Rule 19-308.4(c) when he failed to inform Bar Counsel of his on-going alcohol and/or drug use and failed treatment in an effort to continue practicing law, and where there were no mitigating factors

---

[21] Respondent did not cite to any case law to justify his recommendation for sanction.

or compelling extenuating circumstances). The general rule regarding a violation of Rule 19-308.4(c) is further fortified when there has been an unmitigated misappropriation of client funds. As we have explained, "[A]ny unmitigated misappropriation of a client's or third party's funds, particularly when combined with dishonesty or misrepresentation, will result inevitably in disbarment." *Attorney Grievance Comm'n v. Nwadike*, 416 Md. 180, 204, 6 A.3d 287, 300–01 (2010) (internal quotations omitted). Even though disbarment is "ordinarily" the appropriate sanction when intentional dishonesty is at issue, we nevertheless examine the facts as well as the aggravating and mitigating factors in each case to fashion the appropriate sanction. *See Attorney Grievance Comm'n v. Lane*, 367 Md. 633, 646, 790 A.2d 621, 628 (2002) ("[W]e must examine the facts, circumstances, and mitigation involved in each case and not take a procrustean approach"). In the absence of a finding of intentional dishonest conduct such as negligent misappropriation of funds, generally, we have sanctioned an attorney by imposing an indefinite suspension with a right to apply for reinstatement after a finite period of time. *See Attorney Grievance Comm'n v. DiCicco*, 369 Md. 662, 685, 802 A.2d 1014, 1027 (2002). In *DiCicco*, for example, this Court indefinitely suspended an attorney who, in violation of what are now known as Rules 19-301.15(a), 19-301.15(c), 19-408(a) and 19-410, used his attorney trust account as a personal bank account, allowed his trust account to fall into a low or negative balance on several occasions without explanation, and disbursed monies from his trust account that were not client related. *Id*. at 688, 802 A.2d at 1028.

Where an attorney made cash disbursements from his trust account, and intentionally misrepresented to Bar Counsel and a third party that he sent his client a

54

mortgage release, this Court concluded that the appropriate sanction was an indefinite suspension with a right to apply for reinstatement after ninety days. *Attorney Grievance Comm'n v. Brown,* 415 Md. 269, 281, 999 A.2d 1040, 1047 (2010). There, in determining the appropriate sanction, the Court considered the following mitigating factors: "the [attorney's] 28-year record as a member of the Maryland Bar [was] otherwise impeccable;" his conduct impacted a third party who was not his client, and to whom he owed no duty; the cash withdrawals from his trust account were not used for his personal financial gains; his admission of his wrongdoing; his willingness to take responsibility for his actions; and the *pro bono* work he had provided to the injured third party. *Id.* at 281–82, 999 A.2d at 1047–48.

Under our jurisprudence, there appears to be little to no saving grace for an attorney who has knowingly acted to deceive clients, Bar Counsel, or the Court and where there are no compelling extenuating circumstances to mitigate the attorney's conduct. *See Vanderlinde*, 364 Md. at 413–14, 773 A.2d at 485. For example, in *Attorney Grievance Comm'n v. Mitchell,* this Court disbarred an attorney for his failure to diligently represent and communicate with his clients regarding the status of their cases and for his intentional misrepresentations to clients and Bar Counsel. 445 Md. 241, 265, 126 A.3d 72, 85-86 (2015) (holding that the attorney's violation of Rules 19-301.1, 19-301.2(a), 19-301.3, 19-301.4(a) and (b), 19-303.2, 19-308.1(a) and (b), and 19-308.4(c) and (d) were exacerbated by several aggravating factors and the absence of mitigating factors all warranted the most severe sanction).

Likewise, we disbarred an attorney who "engaged in a pattern of continued deceitful misrepresentations." *Lane*, 367 Md. at 647, 790 A.2d at 629. The attorney in *Lane*, *inter alia*, failed to take substantive actions on behalf of his clients, did not abide by his clients' objectives for representation, did not keep his clients informed about the status of their cases, and knowingly misled and made misrepresentations to his clients. *Id*. The attorney's deceptive misrepresentations deprived his clients of the ability to make informed decisions about their case. *Id*. Similar to Respondent, the attorney in *Lane* failed to provide any mitigation for his misrepresentation but instead "compounded this failure [to diligently act on behalf of his clients] by engaging in a pattern of deceitful and lying conduct designed to conceal his lack of diligence." *Id*. We concluded that the misconduct coupled with a lack of mitigation "could herald problems for his future clients." *Id*.

Although aggravating factors surely exacerbate an attorney's professional misconduct, disbarment may be warranted absent any aggravating factors. In the case of *Attorney Grievance Comm'n v. Wallace*, we disbarred an attorney who demonstrated a lack of diligence, a lack of preparation, a failure to communicate with his clients, a failure to account for and return monies, a failure to comply with Bar Counsel's requests as well as made misrepresentations and charged unreasonable fees. 368 Md. 277, 293, 793 A.2d 535, 545 (2002). That the attorney had not received any previous reprimands or sanctions did not mitigate his conduct. *Id.*

In this case, Respondent's actions were plagued with both negligent misappropriation *and* intentional dishonesty. Respondent made several "tithe" payments to his church, made unearned payments to himself, and withdrew money for copy repairs—

56

all drawn from his client trust account. The hearing judge found that his misconduct did "not rise to the level of criminality or direct misappropriation" but instead appeared to have been "borne of sloppiness and delegating responsibility to others. . . ."[22] Judge Bryant found suspect the amount of work, the nature of the work, and timing of the work that Respondent performed, but ultimately, determined that Respondent "did not merely take the clients' money and run." In other words, the hearing judge did not find that Respondent's misappropriation was intentional. We infer from the hearing judge's findings that Respondent's hubris *combined with* his sloppy case management, excessive delegation of responsibilities to others, his poor record keeping, and his improper handling of monetary matters prevented him from recognizing his misappropriation of client funds.

We, however, cannot overlook Respondent's intentional misrepresentations to his clients and Bar Counsel. Respondent's misappropriations may not have risen to the level of criminality or "direct misappropriation," but the misrepresentations he made to his

---

[22] We have explained previously that there is a narrow difference between *intentional* and *negligent* misappropriation:

> The line between knowing misappropriation and negligent misappropriation is a thin one. Proving a state of mind – here, knowledge – poses difficulties in the absence of an outright admission. However, this Court has noted that an inculpatory statement is not an indispensable ingredient of proof of knowledge, and that circumstantial evidence can add up to the conclusion that a lawyer knew or had to know that clients' funds were being invaded. In this case, that circumstantial evidence includes repeated invasions of client funds that were required to be held inviolate.

*Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 485, 671 A.2d 463, 481 (1996) (internal citations omitted in original, internal quotations omitted) (quoting *Matter of Roth*, 140 N.J. 430, 445(1995) (holding that "[t]he testimony adduced convincingly suggest[ed] that respondent 'knew,' or 'had to know' that he was invading client funds.").

clients and Bar Counsel to justify keeping fees for the little to no work he performed on behalf of his clients, are actions of intentional dishonest conduct. We are troubled here, as we were in *Lane*, that Respondent's conduct was intentional concealment of his non-performance and evidenced an intention to keep unearned funds. *See Lane*, 367 Md. at 647, 790 A.2d at 629. Additionally, a lack of mitigation in the present case does little to alleviate our concern that Respondent may repeat his behavior with future clients. *See id*. Respondent and his legal assistant drafted fabricated billing statements and accounts of time spent on client matters, both of which Respondent submitted to Bar Counsel. Respondent on several occasions told his clients and Bar Counsel that the clients' funds remained in escrow, when they had not. Respondent told Ms. Simmons and her Public Defender that he had drafted her post-conviction petition months before he ever put pen to paper. His actions mirrored the intentional dishonest conduct in *Mitchell* and *Wallace. See Mitchell*, 445 Md. at 250, 126 A.3d at 77 (explaining that the attorney failed to amend a complaint on behalf of his client and, subsequently, deceived Bar Counsel about the status of that complaint); *see Wallace*, 368 Md. at 283-84, 793 A.2d at 539 (explaining that, among other misconduct, the attorney mispresented to his client that he was working on her case).

Respondent's intentional misrepresentations, negligent misappropriation as well as his numerous other rule violations are further exacerbated by several aggravating factors. Without any mitigating factors or compelling extenuating circumstances to consider, there is only one appropriate sanction. *See Thomas*, 445 Md. at 402, 127 A.3d at 576. To achieve our goal of protecting the public, and to follow our principle established in *Vanderlinde*,

58

the appropriate sanction in this case is disbarment.  This order is effective 30 days after the

filing of this opinion.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS PURSUANT TO MARYLAND RULE 19-709(d), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST RESPONDENT.**